## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

```
KEVIN LEE MYERS, JR.,         )
                              )
          Petitioner,         )
                              )
     v.                       )     1:17CR18-1
                              )     1:19CV865
UNITED STATES OF AMERICA,     )
                              )
          Respondent.         )
```

## <u>MEMORANDUM OPINION AND ORDER</u>

This case comes before the undersigned United States Magistrate Judge on Petitioner's "Notice of Conflict of Interest and Motion for Recusal of Magistrate [Judge] L. Patrick Auld" (Docket Entry 83 (the "Recusal Motion")). For the reasons that follow, the Recusal Motion will be denied.[1]

## <u>INTRODUCTION</u>

Following Petitioner's arrest on a warrant issued in connection with a criminal complaint charging him with bank fraud

_____

[1] The undersigned Magistrate Judge has entered an order, rather than a recommendation, on the Recusal Motion, because "[a] motion to recuse is a nondispositive matter," <u>Cleveland v. South Carolina</u>, No. 8:17CV2922, 2017 WL 6498164, at *1 (D.S.C. Dec. 19, 2017) (unpublished) ("affirm[ing] the [m]agistrate [j]udge's order [denying recusal motion under] 'clearly erroneous or contrary to law' [standard]" (quoting 28 U.S.C. § 636(b)(1)(A))); <u>accord</u> <u>Kiser v. Ferris</u>, Civ. No. 2:04-1214, 2009 WL 1770084, at *1 (S.D.W. Va. June 16, 2009) (unpublished); <u>see also</u> <u>Davis v. United States</u>, Nos. 6:95CR284, 1:99CV842, 2002 WL 1009728, at *1 (M.D.N.C. Jan. 8, 2002) (unpublished) (Beaty, J.) ("Motions seeking recusal and disqualification are generally entertained by the challenged judge . . . ."), <u>appeal dismissed</u>, 55 F. App'x 192 (4th Cir. 2003); 28 U.S.C. § 455(a) & (b) (indicating that judge should decide whether to "disqualify himself").

in violation of 18 U.S.C. § 1344, Petitioner made his initial appearance before the undersigned Magistrate Judge and the United States moved for detention. (See Minute Entry and Docket Entries dated Dec. 22, 2016; see also Docket Entry 1 (Criminal Complaint); Docket Entry 2 (Arrest Warrant).) The undersigned Magistrate Judge set a preliminary/detention hearing (see Docket Entry 4) and the United States Probation Office prepared a Pretrial Services Report, which detailed, inter alia, Petitioner's numerous fraud-related convictions and pending charges (see Docket Entry 5 at 4-12) and recommended his detention (see id. at 14; see also Docket Entry 6 (First Addendum to Pretrial Services Report documenting additional unserved warrants and reiterating recommendation of detention)).

At the preliminary/detention hearing (before the undersigned Magistrate Judge), Petitioner "declined to present evidence or contest [the] Pretrial Service[s] Report" (Minute Entry dated Dec. 29, 2016), whereupon "[p]robable cause [was] found" (id.) and he was "detained" (id.; see also Docket Entry 7 ("Detention Order") at 2 ("[T]he United States relied on the affidavit attached to the Criminal Complaint (Docket Entry 1 at 2-8). [Petitioner] did not contest the existence of probable cause, presented no evidence, and proffered no release plan."), 7-8 ("[T]he record establishes by a preponderance of the evidence that no combination of available release conditions would reasonably assure [Petitioner's] appearance. In this regard, the Court notes, in particular, the

-2-

sophisticated and large-scale nature of the instant offense conduct and surrounding circumstances showing risk of non-appearance, [Petitioner's] significant history of committing fraud-based crimes and failing to comply with court-ordered conditions, [his] very recent failure to appear in court as required, and the absence of any release plan. . . . Should [Petitioner] develop a plausible release plan, he may move the Court to reopen this matter.")).

A few weeks later, Petitioner filed a "Motion to Set Conditions of Pretrial Release and Request Hearing" (Docket Entry 8 ("Release Motion") at 1; see also Docket Entry 9 (Second Addendum to Pretrial Services Report)), which – after a hearing (see Minute Entry dated Jan. 31, 2017) – the undersigned Magistrate Judge "[g]ranted" (id.; see also Docket Entry 10 (Order Setting Conditions of Release ("Release Order"))). The conditions set by Petitioner's Release Order included a directive that he "refrain from contact with Kimberly Martin" (Docket Entry 10 at 2), as recommended by the Probation Office (see Docket Entry 9 at 2 (proposing as condition that Petitioner "[r]efrain from any contact with . . . Kimberly Martin" (bold font omitted))) and endorsed by Petitioner (see Docket Entry 20 at 1 ("When [Petitioner] subsequently came forward with a release plan that included . . . a prohibition on contact with Kimberly Martin, the Court permitted [his] release.")). On the same day the undersigned Magistrate Judge issued the Release Order, a grand jury indicted Petitioner

-3-

for four counts of bank fraud in violation of 18 U.S.C. § 1344, two counts of possessing a counterfeited security in violation of 18 U.S.C. § 513(a), and one count of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1). (See Docket Entry 12 at 1-10.) Petitioner thereafter pleaded guilty to two of the bank fraud counts (before United States District Judge Loretta C. Biggs). (See Minute Entry dated Mar. 6, 2017; see also Docket Entry 18 (Plea Agt.); Docket Entry 52 (Plea Hrg. Tr.).)

Just prior to Petitioner's entry of that guilty plea, he filed a "Motion to Modify Conditions of Pretrial Release and Request Hearing" (Docket Entry 19 ("Modification Motion") at 1), asking the Court "to consider modifying the conditions of pretrial release . . . to remove the no contact element" (id.; see also id. ("The terms and conditions of [Petitioner's] release included a no contact provision with his fiancé, Kimberly Martin. However, [Petitioner] and Ms. Martin are scheduled to be married on April 27, 2017.")). The undersigned Magistrate Judge granted the Modification Motion in part, "in that the condition prohibiting contact between [Petitioner] and Kimberly Martin [wa]s modified to prohibit contact between [them] except in the presence of the third-party custodian." (Docket Entry 20 ("Modification Order") at 3; see also id. at 2-3 ("Given Ms. Martin's inevitable access to sensitive personal and financial information through her business (i.e., the very sort of information that [Petitioner] has used to

commit his crimes) and her willingness to involve [him] in that business notwithstanding his lengthy history of fraud, along with her obvious tolerance for or obliviousness to his commission of large-scale fraud while employed by and/or living with her, the Court declines to allow [them] to simply return to 'business as usual' while he awaits entry of his guilty plea and sentencing, merely because they now claim to have set a wedding date.").)

At the conclusion of the plea hearing, Judge Biggs "allowed [Petitioner] to remain on pretrial release pending the sentencing in this matter." (Docket Entry 52 at 14.) Petitioner requested that Judge Biggs extend the relief granted in the Modification Order by further modifying the Release Order to remove any limitation on Petitioner's contact with Ms. Martin (see id. at 14-16), but Judge Biggs "decline[d] to alter [the] conditions of release" (id. at 17). Judge Biggs subsequently sentenced Petitioner to, inter alia, a term in prison. (See Docket Entry 54 at 32 ("[Petitioner] is committed to the custody of the Bureau of Prisons on Count One to 70 months and for a term of 70 months on Count Six. Those shall run concurrently."); see also id. at 37-38 (denying Petitioner's request to self-report to Bureau of Prisons and placing him in custody).) Following entry of his Judgment (Docket Entry 46), Petitioner filed Notice of Appeal (Docket Entry 48), but the United States Court of Appeals for the Fourth Circuit dismissed his appeal (see Docket Entry 55 at 1 (concluding that

Petitioner "knowingly and voluntarily waived his right to appeal, and that the issues [he] seeks to raise on appeal fall squarely within the scope of his waiver")).

Petitioner thereafter filed a Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (Docket Entry 63 ("Section 2255 Motion")), to which the undersigned Magistrate Judge ordered the United States to respond (see Docket Entry 66 at 1-2). The United States, in turn, filed a Motion to Dismiss and Response (Docket Entry 71) and Petitioner responded in opposition (see Docket Entry 75). More than three months later, Petitioner filed the Recusal Motion, "giv[ing] official notice to the Court of a conflict of interest . . . and predetermined prejudicial statements by [the undersigned Magistrate Judge] about [Petitioner], in the very early stages of his case." (Docket Entry 83 at 1.)[2] The United States opposed the Recusal Motion (see Docket Entry 86) and, at Petitioner's request (see Docket Entry 95), the undersigned Magistrate Judge "appointed [counsel] to represent Petitioner for the limited purpose of evaluating [the Recusal Motion] and filing a reply" (Text Order dated July 13, 2020).

In a filing entitled "Notice of Conflict of Interest between Court Appointed Counsel and [Petitioner]" (Docket Entry 111 at 1), dated as signed on August 10, 2020 (see id. at 6), Petitioner

---

[2] In quoting Petitioner's handwritten filings, this Order applies standard capitalization conventions.

declared that he "ha[d] instructed [his appointed counsel] by email on August 7[,] 2020 to withdraw from this case and take no further action on [Petitioner's] behalf" (id. at 3; see also id. at 4 ("[Petitioner] requests that this Court allow his [appointed counsel to] withdraw. And should [his appointed counsel] fail to motion this Court to withdraw, [Petitioner] requests that this Court remove [his appointed counsel] . . . due to irreconcilable differences. Moreover, [Petitioner] requests that this Court appoint counsel from outside of this district due to the circumstances that comes [sic] with this case. Should the Court deny this request for counsel outside the district, [Petitioner] wishes to have no counsel at all . . . .")). The undersigned Magistrate Judge promptly struck the reply filed by Petitioner's appointed counsel – on August 12, 2020 (see Docket Entry 110 at 8) – "in light of [the above-quoted] Notice, declin[ed] to appoint new counsel, and g[ave Petitioner more time] to file his own pro se reply [in support of the Recusal Motion]." (Text Order dated Aug. 25, 2020.) Petitioner timely replied. (See Docket Entry 116.)

<u>DISCUSSION</u>

"There are two sections in the United States Code pursuant to which a party may request that a judge be recused from a case, Title 28 U.S.C. §§ 144 and 455." Okocha v. Adams, No. 1:06CV275, 2007 WL 1074664, at *3 (M.D.N.C. Apr. 9, 2007) (unpublished) (Osteen, Sr., J.), aff'd, 259 F. App'x 527 (4th Cir. 2007). The

only provisions of the latter statute that conceivably could apply to the allegations of the Recusal Motion state: "(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his <u>impartiality might reasonably be questioned</u>. (b) He shall also disqualify himself . . . [w]here he has a <u>personal bias or prejudice</u> concerning a party . . . ." 28 U.S.C. § 455 (emphasis added).[3] The other recusal-related statute mirrors that language from Subsection 455(b): "Whenever a party . . . makes and files a timely and <u>sufficient affidavit</u> that the judge before whom the matter is pending has a <u>personal bias or prejudice</u> either against [the filing party] or in favor of any adverse party, such judge shall proceed no further . . . ." 28 U.S.C. § 144 (emphasis added); <u>see also Liteky v. United States</u>, 510 U.S. 540, 548 (1994) (observing that "paragraph (b)(1) [of § 455] entirely duplicate[s] the grounds of recusal set forth in § 144").[4]

---

[3] The other portions of Subsection 455(b) address situations involving a judge's "personal knowledge of disputed evidentiary facts concerning the proceeding," 28 U.S.C. § 455(b)(1), prior work in "private practice," 28 U.S.C. § 455(b)(2), or "governmental employment," 28 U.S.C. § 455(b)(3), "financial interest[s]," 28 U.S.C. § 455(b)(4), and "spouse, or a person within the third degree of relationship to either [the judge or judge's spouse], or the spouse of such a person," 28 U.S.C. § 455(b)(5).

[4] Petitioner did not verify either the Recusal Motion (<u>see</u> Docket Entry 83 at 9) or his reply (<u>see</u> Docket Entry 116 at 19) and thus neither constitute an affidavit for purposes of satisfying the requirements of Section 144 or providing evidentiary support for relief under Section 455, <u>see, e.g.</u>, <u>Taebel v. Ducey</u>, Civ. No. 19-
(continued...)

In light of that overlapping language, "the substantive standard for recusal under [these provisions of] 28 U.S.C. § 144 and 28 U.S.C. § 455 is the same, namely, whether a reasonable person with knowledge of the relevant facts would conclude that the judge's impartiality might reasonably be questioned." Davis v. United States, Nos. 6:95CR284, 1:99CV842, 2002 WL 1009728, at *2 (M.D.N.C. Jan. 8, 2002) (unpublished) (Beaty, J.) (internal brackets and quotation marks omitted)), appeal dismissed, 55 F. App'x 192 (4th Cir. 2003). Put another way, "[t]he inquiry is whether a reasonable person would have a reasonable basis for

---

[4](...continued)
323, 2019 WL 11766285, at *2 (D. Ariz. May 3, 2019) (unpublished) ("[The p]laintiff has not demonstrated that recusal pursuant to either § 455 or § 144 is warranted. . . . [ The p]laintiff has failed to provide the affidavit required by § 144, or to state facts and reasons, under oath, for why he believes that the undersigned has any bias or prejudice against him. Accordingly, recusal is not appropriate . . . ."), appeal dismissed, No. 19-16169, 2020 WL 8611758 (9th Cir. Mar. 30, 2020) (unpublished); Smith v. Texas, Civ. No. H-12-469, 2012 WL 13055449, at *2-3 (S.D. Tex. Dec. 31, 2012) (unpublished) (rejecting recusal request where moving party's filing "was not sworn to" and thus he "produced no evidence to support his allegations"); see also Blakely v. USAA Cas. Ins. Co., No. 2:06CV506, 2012 WL 6115625, at *10 (D. Utah Dec. 10, 2012) (unpublished) ("Unsworn declarations or statements that are not subscribed under penalty of perjury under the laws of the United States as required by [28 U.S.C.] § 1746 cannot serve as affidavits, particularly under a strict construction of [Section] 144." (internal ellipsis, emphasis, and quotation marks omitted)); Turley v. Rednour, Nos. 08CV377, 09CV829, 2011 WL 13272361, at *1 (S.D. Ill. June 9, 2011) (unpublished) ("[The plaintiff's] filing does not trigger the § 144 procedures . . . . The requirements of § 144 are to be strictly construed to prevent abuse. As [the plaintiff's] filing is not made under oath, affirmation or penalty of perjury, it is not an affidavit and does not meet the strictly construed requirements necessary to trigger § 144 procedures." (internal quotation marks and citation omitted)).

questioning the judge's impartiality . . . . A presiding judge is not, however, required to recuse himself simply because of unsupported, irrational or highly tenuous speculation." United States v. Cherry, 330 F.3d 658, 665 (4th Cir. 2003) (internal quotation marks omitted); see also id. ("The test is an objective one . . . ."); Okocha, 2007 WL 1074664, at *4 ("'A judge against whom an affidavit under § 144 is filed must pass upon the legal sufficiency of the facts alleged. It is equally [the judge's] duty, however, to deny the relief claimed on account of the facts stated in the affidavit if they are legally insufficient, as it is to grant relief if they are sufficient.'" (internal ellipsis omitted) (quoting Sine v. Local No. 922 Int'l Bhd. of Teamsters, 882 F.2d 913, 914 (4th Cir. 1989))); Davis, 2002 WL 1009728, at *1 (explaining that, when reviewing affidavit under Section 144, "[t]he judge is not required . . . to consider conclusory statements, opinions, or speculations").

Moreover, these recusal provisions "carry an 'extrajudicial source' limitation, under which bias or prejudice must, as a general matter, stem from 'a source outside the judicial proceedings at hand' in order to disqualify a judge." Belue v. Leventhal, 640 F.3d 567, 572 (4th Cir. 2011) (internal citations omitted) (first quoting Liteky, 510 U.S. at 551, 554, and then quoting id. at 545). "Of course, the [Supreme] Court was careful to not make the extrajudicial source limitation an ironclad rule.

. . . Nevertheless, the [Supreme] Court did make clear that parties would have to meet a high bar to achieve recusal based on in-[case] predispositions." <u>Belue</u>, 640 F.3d at 573. Specifically:

> [J]udicial rulings and "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings" almost "never constitute a valid basis for a bias or partiality motion." Likewise, judicial remarks that are "critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge."

<u>Id.</u> (internal citation omitted) (quoting <u>Liteky</u>, 510 U.S. at 555).

Here, the Recusal Motion lists five considerations that allegedly disqualify the undersigned Magistrate Judge. (<u>See</u> Docket Entry 83 at 2-3.) First, the Recusal Motion states "that [the undersigned] Magistrate [Judge] issued the warrant in this case based upon the false information sworn before him on 9/29/2016 by [a law enforcement officer], which led to [the I]ndictment on 1/31/17." (<u>Id.</u> at 2.)[5] The Recusal Motion, however, does not allege (much less offer any competent evidence to show) that the undersigned Magistrate Judge knew of any purported falsity in the sworn information presented in support of the Criminal Complaint. (<u>See</u> <u>id.</u>; <u>see also</u> Docket Entry 116 at 4 (reiterating "[Petitioner's] conten[tion] that [the undersigned] Magistrate [Judge] displayed partiality . . . by accepting false statements by

---

[5] The quotation above reflects a fundamental misunderstanding of the federal criminal charging process, as the issuance of a criminal complaint does not lead to an indictment. <u>See generally</u> Fed. R. Crim. P. 3, 4, 6, 7, 9.

[a law enforcement officer] in determining probable cause in the criminal complaint (which led to indictment)," but not even suggesting that undersigned Magistrate Judge possessed knowledge of any such falsity), 13 (repeating allegation that undersigned Magistrate Judge "issued the warrant in this case on September 29, 2016 based upon the false information [a law enforcement officer] alleged as the factual basis for the warrant," but without attempting to show that the undersigned Magistrate Judge knew about any purported misstatement of fact).)

In the absence of any showing that the undersigned Magistrate Judge knowingly credited false information in issuing the Criminal Complaint, the Recusal Motion's first – and "most important[]" (Docket Entry 83 at 2) – basis for recusal amounts to nothing more than "seek[ing] recusal because [Petitioner] is unhappy with the Court's adverse rulings," McSwain v. Jobs, No. 1:13CV890, 2014 WL 12495108, at *1 (M.D.N.C. Apr. 2, 2014) (unpublished) (Eagles, J.). "A judge is not required to automatically disqualify himself from a lawsuit simply because a litigant is displeased with the judge's previous adverse rulings . . . ." Freeze v. VA Med. Ctr., Nos. 1:05CV219 & 220, 2005 WL 6058712, at *1 (M.D.N.C. June 21, 2005) (unpublished) (Bullock, J.); see also McSwain, 2014 WL 12495108, at *1 ("When a party disagrees with the rulings of a [m]agistrate [j]udge, [the party] is free to file appropriate objections. If [the party] disagrees with how those objections are treated by the

-12-

district [judge], [the party] may file a notice of appeal. . . .
[The party] is not allowed to challenge court orders by the back
door of a recusal motion . . . ."); Davis, 2002 WL 1009728, at *5
("[The moving party's] only support for his contention [of judicial
bias] comes from his unsupported conclusion based upon his
disagreement with the orders of the Court. . . . Without
considering [the moving party's] speculations and conclusions,
there is nothing left to support his claim that adverse rulings are
evidence of the [judge's] alleged bias.").

The Recusal Motion secondly asserts that, "before and [sic]
indictment, plea or discovery, [the Detention Order] referred to
[Petitioner] as 'a master of deceit, and a doyen of dishonesty.'"
(Docket Entry 83 at 2 (quoting Docket Entry 7 at 3).) The United
States rightly labeled that argument "plainly incorrect, as that
reference appears as a quotation of a cited case, and not a
reference to [Petitioner] himself." (Docket Entry 86 at 6-7
(citing Docket Entry 7 at 3 (parenthetically quoting United States
v. Dreier, 596 F. Supp. 2d 831, 832-33 (S.D.N.Y. 2009))).)
Moreover, the citation to Dreier did not constitute a gratuitous,
implicit jab at Petitioner; rather, it supported the proposition
that courts find a risk of flight in cases with defendants (like
Petitioner) accused and/or previously convicted of serious fraud
crimes, a part of the analysis mandated under 18 U.S.C. § 3142(g),
which the Court had to undertake before return of the Indictment

-13-

and Petitioner's plea, based on available information, irrespective of what discovery the United States had produced at that point, see 18 U.S.C. § 3142(f) (requiring detention hearing to occur within five business days of arrest).  (See Docket Entry 7 at 2-4.)  Accordingly, to the extent a reasonable reader could deem the Detention Order's citation to Dreier "critical or disapproving of, or even hostile to, [Petitioner]," Belue, 640 F.3d at 573 (internal quotation marks omitted), it does not "meet [the] high bar to achieve recusal based on in-[case] predispositions," id.; see also id. (noting that hostile comments in court rulings "ordinarily do not support a bias or partiality challenge" (internal quotation marks omitted)); Turley v. Rednour, Nos. 08CV377, 09CV829, 2011 WL 13272361, at *2 (S.D. Ill. June 9, 2011) (unpublished) ("[A] reasonable person for purposes of a § 455 inquiry is a thoughtful observer rather than a hypersensitive or unduly suspicious person. The reasonable person also . . . can discern whether any appearance of impropriety is merely an illusion." (internal quotation marks, ellipsis, and citation omitted)).

The third basis for recusal in the Recusal Motion rests on the assertion that the Detention Order "presume[s] guilt by alleging that [Petitioner] stole the tax ID number of [a business] before any indictment, discovery or plea."  (Docket Entry 83 at 3 (citing Docket Entry 7 at 3-4); see also id. at 5 (characterizing Detention Order as "pep rally for the government's false charges").)  Again,

-14-

for reasons well-explained by the United States, that "third claim is similarly baseless" (Docket Entry 86 at 7):

> The finding referenced by [Petitioner] was made in the context of the magistrate judge's duty to make a determination regarding the weight of the evidence with respect to detention, as required in 18 U.S.C. § 3142(g)(2). The magistrate judge thus had to make findings under the law regarding the evidence of the crime presented; it was not a determination of guilt, but rather a characterization based on the evidence.

(Id.; see also Docket Entry 7 at 2 ("[T]he United States relied on the affidavit attached to the Criminal Complaint (Docket Entry 1 at 2-8). [Petitioner] did not contest the existence of probable cause[ and] presented no evidence . . . .").)[6]

---

[6] Nor could the Detention Order's description of the evidence support an inference of bias against Petitioner, given that (as outlined in the Introduction) the undersigned Magistrate Judge subsequently granted the Release Motion (filed by Petitioner) and entered the Release Order (adopting Petitioner's release plan). That fact also dispels the Recusal Motion's intimation of disqualifying bias based on the fact that the undersigned Magistrate Judge "once was [Deputy] Chief [] of the Criminal Division for the U.S. Attorney's Office, Middle District NC" (Docket Entry 83 at 5; see also Docket Entry 86 at 9-10 ("[Petitioner] cites the [undersigned M]agistrate [J]udge's prior service as a federal prosecutor in support of his allegations of bias and prejudice, but this argument is without basis in law. As the Fourth Circuit [has] stated . . ., 'litigants are entitled to a judge free of personal bias, but not to a judge without any personal history before appointment to the bench.'" (internal citation omitted) (citing and quoting Sierra Club v. Simkins Indus., Inc., 847 F.2d 1109, 1117 (4th Cir. 1988))). In any event, any such "argument [for recusal] relies on unsupported speculation that [service in that] former position as [a supervisory Assistant] United States Attorney . . . calls [the undersigned Magistrate] Judge['s ] impartiality into question. . . . [T]he mere fact[] of [such] government service . . . [is] insufficient to justify [the undersigned Magistrate Judge's] recusal." United States v. Miller, 221 F. App'x 182, 185 (4th Cir. 2007).

-15-

For its fourth justification for disqualification of the undersigned Magistrate Judge, the Recusal Motion complains:

> [The Modification Order] states . . . that [Petitioner] is 'a career con man.' [It] further falsely states that [Petitioner's] wife (then fiancé) Kimberly Myers operated a [sic] employee benefits company out of her home, and paid [him] $90,000 per year salary. [Petitioner's] wife never operated any business out of her home and never at any time paid [him] a salary.

(Docket Entry 83 at 3 (internal citation omitted) (quoting and citing Docket Entry 20 at 2).) Those allegations do not warrant recusal. To begin, the Modification Order does not state that Petitioner's then-fiancé operated her employee benefits company from her home. (See Docket Entry 20 at 2.) Additionally, the Pretrial Services Report (filed on December 28, 2016) – which Petitioner did not contest (see Minute Entry dated Dec. 29, 2016) – explicitly documents his "Employer Name" as "St. Claire Group" with a "Start Date" of "12/22/2012" and "End Date" of "Present" and a "Monthly Income" of "$7,500," i.e., $90,000 annually (12 x $7,500 = $90,000) (Docket Entry 5 at 2; see also id. (listing "Time in Status" as "4 years")), while also reporting that Petitioner's fiancé "owns St. Claire Group, an employment benefits company in Thomasville, NC, where [Petitioner] is currently employed" (id.).[7]

_____

[7] The quotations above from the Pretrial Services Report conclusively refute the contention in Petitioner's reply that "[i]t appears that [the undersigned] Magistrate [Judge] had ex parte conversations with an extrajudicial source based upon his incorrect finding . . . that Ms. Martin operates an employee benefit company and purportedly employed [Petitioner] in that business at an annual
(continued...)

-16-

Accurately recounting undisputed, record information about Petitioner's claimed employment does not evince bias of any sort.

Lastly (as to the Recusal Motion's fourth basis for relief), the Modification Order (reasonably) describes Petitioner as a "career con man" not in a fit of pique exemplifying personal prejudice, but instead for the pertinent purpose of explaining why the undersigned Magistrate Judge declined to eliminate all restrictions on Petitioner's contact with his employer/fiancé, which (as detailed in the Introduction) the Probation Office previously had recommended and Petitioner previously had endorsed:

> The [Detention Order] originally ordered [Petitioner] detained as a flight risk. In doing so, the [Detention Order] noted "that the instant offense conduct involved [Petitioner's] engagement in an elaborate scheme to defraud banks, including by asserting false ties to a legitimate business, and followed a pattern of fraudulent dealing by [Petitioner] over the course of many years involving substantial sums of money." When [Petitioner] subsequently came forward with a release plan that included provisions for a reliable third-party custodian,

---

⁷(...continued)
salary of $90,000 during the time period of the Count One offense conduct and the earlier offense conduct of Count Six." (Docket Entry 116 at 14 (internal quotation marks omitted); <u>see also id.</u> at 14-15 (asserting that Petitioner only "told Pretrial Services that his wife was considering the possibility of starting a company and that he could make around six figures" and speculating that agents who arrested Petitioner "may very well have been the 'extrajudicial source' that [the undersigned] Magistrate [Judge] got his incorrect information from"), 16-17 (acknowledging that Petitioner may "have said something while not being in his right mind that led Pretrial Services to believe that he worked for his wife in some kind of employee benefits company," but nonetheless (incorrectly) insisting that "the information regarding an employee benefit company . . . does not appear in the Pretrial Service[s] Report[] except as previously stated in this reply").)

home incarceration, and a prohibition on contact with Kimberly Martin, the Court permitted [his] release. [Petitioner] now has moved for modification of th[e R]elease [O]rder "to remove the no contact element" because "[he] and Ms. Martin are scheduled to be married on April 29, 2017."

As noted above (and as documented in the [ D]etention [O]rder), [Petitioner] is a career con man, who most recently has engaged in a significant fraud involving theft of the identity of a legitimate business. [Petitioner] lived with Ms. Martin from May 2016 through his arrest on the instant federal charges. The offense conduct charged in Count One of the Indictment against [Petitioner] (to which he has agreed to plead guilty) occurred from May 1 to September 30, 2016. Further, Ms. Martin operates "an employment benefits company" and purportedly employed [Petitioner] in that business at an annual salary of $90,000 during the period of the Count One offense conduct, as well as the time-frame of the earlier offense conduct charged in Count Six (to which he also has agreed to plead guilty) and of his service – and violation – of probation for prior felony fraud convictions. Given Ms. Martin's inevitable access to sensitive personal and financial information through her business (i.e., the very sort of information that [Petitioner] has used to commit his crimes) and her willingness to involve [Petitioner] in that business notwithstanding his lengthy history of fraud, along with her obvious tolerance for or obliviousness to his commission of large-scale fraud while employed by and/or living with her, the Court declines to allow [Petitioner] and Ms. Martin to simply return to business as usual while he awaits entry of his guilty plea and sentencing, merely because they now claim to have set a wedding date.

(Docket Entry 20 at 1-3 (internal citations, ellipsis, and final set of quotation marks omitted) (quoting Docket Entry 7 at 3, Docket Entry 19 at 1, and Docket Entry 5 at 2, respectively) (citing, inter alia, Docket Entries 5, 7, 9, 10, 12, and 18); see also id. at 3 (granting Modification Motion in part by modifying Release Order's "condition prohibiting contact between [Petitioner]

-18-

and Kimberly Martin . . . to prohibit contact between [them] except in the presence of the third-party custodian").)

With that context, accepting that a reasonable observer would construe the Modification Order's use of the term "career con man" as "critical or disapproving of, or even hostile to, [Petitioner]," Belue, 640 F.3d at 573 (internal quotation marks omitted), he cannot "meet [the] high bar to achieve recusal based on in-[case] predispositions," id.; see also United States v. Cronin, 429 F. App'x at 241, 242-43 (4th Cir. 2011) ("Unfavorable and even caustic remarks based on a defendant's conduct may be appropriate and generally do not create an appearance of partiality. . . . [T]he district court described [the defendant] in unflattering terms, including 'sociopath' and 'monster.'  The district court's characterizations, while arguably intemperate, constituted a reflection of the facts before [it]. . . .  [They] did not create an appearance of improper bias, but rather reflected a reasoned opinion based on the circumstances of [the defendant's] scheme to commit fraud of significant magnitude . . . ." (internal quotation marks omitted)); United States v. Roberts, 64 F. App'x 473, 475-76 (6th Cir. 2003) (holding that judge's description of defendant as "con man" did not justify recusal, as it "did not display a deep-seated antagonism rendering a fair judgment impossible").  Indeed, the fact that the Modification Order granted Petitioner partial relief belies any suggestion that its language "reveal[s] such a

-19-

high degree of . . . antagonism as to make a fair judgment impossible," Liteky, 510 U.S. at 555.

Petitioner's reply devotes substantial space to arguments aimed at calling into question the accuracy of the Modification Order's use of the term "career con man" in reference to Petitioner, including by attributing (at least some of) his prior offenses to mental health conditions and/or medications (see Docket Entry 116 at 6), attempting to shoehorn his criminal history into a tight temporal window (see id. at 7-8), minimizing the seriousness of his past crimes (see id. at 11), and analyzing a North Carolina recidivism statute (see id. at 17-18). Those efforts fall short on several fronts. For instance, as to mental health, the Pretrial Services Report – the sole source of information about Petitioner available to the undersigned Magistrate Judge at the time of the Modification Order's entry (other than the Criminal Complaint) – relates that Petitioner only "reported he suffers from anxiety and was treated following his divorce in 2006" (Docket Entry 5 at 3; see also id. (noting that "[Petitioner's] fiancé disclosed that [he] was recently treated" for unspecified mental health issues (emphasis added))), not "that [he] has suffered from a number of mental disorders dating back to his childhood, and most recently in 2009 was diagnosed with bipolar disorder, borderline personality disorder, as well as post traumatic stress disorder, anxiety and panic disorder" (Docket

-20-

Entry 116 at 6 (internal citation omitted)), or that, "[i]n 2007 about (90) days after [he] was placed on a psychotropic antidepressant medication . . ., he according to official medical records developed mania, an adverse reaction to the medication which led to him going on a spending frenzie [sic]" (id.).

Furthermore, although Petitioner's reply myopically focuses on eight sets of felony convictions from August 15, 2008 to December 15, 2009, with offense dates between July 23, 2007 and March 22, 2008 (according to Petitioner's account of unspecified prison records) (see id. at 7), with (per Petitioner) "no intervening arrest" (id. at 8), the Pretrial Services Report documents:

1) Petitioner's six arrests in various jurisdictions between October 18, 2007 and March 17, 2008 (i.e., interspersed throughout the offense conduct dates his reply highlighted), which ultimately resulted in six different sets of convictions for (in total) five felony false pretense offenses, two felony worthless check offenses, and one misdemeanor larceny by trick offense (pled down from a felony false pretense charge) (see Docket Entry 5 at 4-6);

2) followed by ten more arrests of Petitioner on different dates from April 15, 2008, through February 2, 2009, which ultimately resulted in at least seven different sets of convictions encompassing four felony worthless check offenses and nine felony false pretense offenses (see id. at 6-10);

-21-

3) after which (while on probation for the foregoing convictions) Petitioner received at least five violations between December 11, 2008 and January 27, 2014, one of which resulted in revocation of probation on June 4, 2010 (and imprisonment through April 5, 2011), another of which led to an extension of probation on January 18, 2012, and a third of which garnered a 90-day custody sanction on January 27, 2014 (see id. at 4-10);

4) the last of which came on the heels of Petitioner's arrests on December 8, 2013 and January 15, 2014, for misdemeanor larceny and worthless check offenses, which ultimately resulted in convictions and more probation, during which he committed yet another misdemeanor worthless check offense (see id. at 10-11);

5) all before Petitioner began a new crime spree on or about May 5, 2016, which continued unabated until his arrest in this case, during which time-span he incurred multiple arrests for fraud-related offenses in multiple jurisdictions, along with a habitual felon charge (see id. at 11-12).

In sum, the record before the undersigned Magistrate Judge at the time of the filing of the Modification Motion revealed that, during the near-decade-long period from 2007 to 2016, Petitioner (from the age of 23 to 32, i.e., virtually his entire adult life to that moment) continuously engaged in criminal fraud, undeterred by arrests, convictions, probation, and prison. "Career con man" reasonably describes that lengthy pattern of repetitive criminal

-22-

behavior, regardless of whether Petitioner believes (A) mental
health problems and/or medications, not disclosed to the Court at
the time of the issuance of the Modification Order, caused some of
his crimes (see Docket Entry 116 at 6), (B) his twenty or more
felony convictions qualify as "very minor" offenses, which "harmed
noone because 70% of the money was paid back, plus many received
insurance reimbursements that they never reported to the court so
that they could double dip" (id. at 11 (emphasis omitted); see also
id. ("That's not a victim.")), or (C) his record of recidivism does
not meet all the technical strictures of North Carolina's habitual
felon statute (see id. at 17-18).

The fifth (and final) item on the Recusal Motion's list of
grounds for recusal asserts that the undersigned Magistrate Judge
"incinuates [sic] that the wedding planned at Green Street Baptist
Church for April 29, 2017 was not so and states [Petitioner] and
Ms. Martin want to get back to business as usual." (Docket Entry
83 at 3 (internal quotation marks omitted).) As shown by the full
text of the Modification Order (quoted above), the undersigned
Magistrate Judge simply used the phrase "business as usual" to
underscore that Petitioner and Ms. Martin could not interact
without restriction due to her past employment of him in her
employment benefits business (which necessarily involved access to
financial and other information subject to misappropriation),
coupled with her apparent acquiescence in or inability to detect

-23-

his commission of fraudulent conduct while they lived and/or worked together. (<u>See</u> Docket Entry 20 at 2-3.) Neither the inclusion of the phrase business as usual nor the accurate observation that the Modification Motion "claim[ed Petitioner and his then-fiancé] ha[d] set a wedding date" (<u>id.</u> at 3; <u>see also</u> Docket Entry 19 at 1 (proffering, without any supporting detail or documentation, that "[Petitioner] and Ms. Martin are scheduled to be married on April 29, 2017")) "reveal[s] such a high degree of . . . antagonism as to make a fair judgment impossible," <u>Liteky</u>, 510 U.S. at 555.

Apart from its foregoing five listed factors favoring recusal, the Recusal Motion also asserts that a telephone conversation between Petitioner's then-counsel and "Anand P. Ramaswamy" (the Assistant United States Attorney ("AUSA") directing Petitioner's prosecution), which Petitioner allegedly overheard on December 29, 2016, "while in the holding tank at the Federal Courthouse in Greensboro waiting for [his] detention hearing to start" (Docket Entry 83 at 6), shows that "AUSA [] Ramaswamy recognized [the undersigned Magistrate Judge's] prejudice towards defendants" (<u>id.</u>). Over more than a page and a half of single-spaced text, the Recusal Motion purports to recreate verbatim (quotation marks included) "how [Petitioner] remembers the call" (<u>id.</u>). (<u>See</u> <u>id.</u> at 6-7.)[8] Petitioner's purported transcript features content with the

_____

[8] Petitioner's reply undermines the notion that he could recall lengthy dialogue from any such conversation. (<u>See</u> Docket
(continued...)

-24-

distinctive ring of what the United States Supreme Court has denominated the "factually frivolous," i.e., the "fanciful," the "fantastic," and/or the "wholly incredible," <u>Denton v. Hernandez</u>, 504 U.S. 25, 33 (1992) (internal quotation marks omitted).

By way of example, according to Petitioner, AUSA Ramaswamy began the conversation by expressing disbelief that the Probation Office had recommended detention rather than "recommend[ing Petitioner's release with] electronic monitoring" (Docket Entry 83 at 6; <u>see also</u> <u>id.</u> ("I mean jeeze, I thought they would at least recommend electronic monitoring.")), and then supposedly asked: "'Who is the Judge in there today, is it Tilley?'" (<u>Id.</u>) However, district judges (like Senior United States District Judge N. Carlton Tilley, Jr.) do not conduct detention hearings in this District, a fact well-known to every member of the United States Attorney's Office for the Middle District of North Carolina. In similarly implausible fashion, after Petitioner's then-counsel allegedly identified the undersigned Magistrate Judge as the judge handling the detention hearing, the Recusal Motion quotes AUSA Ramaswamy as directing Petitioner's then-counsel to fabricate a story of unpreparedness to facilitate judge-shopping:

---

[8](...continued)
Entry 116 at 16 ("[D]uring the period of time between December 22, 2016 and [the issuance of the Modification O]rder[, Petitioner] was in a hypomanic stage of bipolar disorder . . . . [He] was so impaired back around that time . . . that he does not remember a lot of detail to what went on or what was said and done.").)

[Defense counsel]: "No, it's Patrick."

Ramaswamy: "Oh jeeze. . . . Here's what I want you to do."

[Defense counsel]: "What's that Ram"?

. . . .

Ramaswamy: "Look, I want you to go in there, tell Patrick something, look, we have had the holidays and the prosecutor, probation, and myself have not had time to get together on this and I'd like to reserve the right to be heard at a later time."

[Defense counsel]: "I agree Ram."

Ramaswamy: "I don't want him in front of Patrick, I don't want him in front of Patrick, you know how he is. If he thinks we have an agreement, he will go against all of us. You know, that's just how he always is."

[Defense counsel]: "I agree Ram."

Ramaswamy: "You know, that is just the nature of the beast that we are dealing with here. I'm not trying to hurt your client."

[Defense counsel]: "I'd like to get him on [United States Magistrate Judge Joe L.] Webster's docket even if we have to drive to Durham."

Ramaswamy: "Yea, that will be a lot better. You know, I'm not trying to hurt your client."

[Defense counsel]: "Sounds like a plan Ram."

Ramaswamy: "Yea, I'll call [AUSA] Bob [Hamilton] right now and fill him in, tell him everything, he'll play along. I'm pretty sure he's in court for us today."

[Defense counsel]: "Thanks Ram . . . ."

(Id. at 6-7; see also id. at 8 ("[Petitioner's then-counsel] sent [Petitioner's fiancé] a text to her phone on that evening of 12/29/16 detailing that very phone call that [Petitioner]

-26-

witnessed, stating '[Petitioner] heard it for himself.' We have that screenshot giving those details of that call from [Petitioner's then-counsel's] phone with date and time.").)

Setting aside the inherent unbelievability of that narrative, the comments attributed to AUSA Ramaswamy do not articulate any facts which could cause a reasonable person to conclude that the undersigned Magistrate Judge harbors any personal prejudice against Petitioner; to the contrary, at most, the alleged conversation reflects AUSA Ramaswamy's unexplained belief that the undersigned Magistrate Judge (for unexplained reasons) reflexively rejects agreements between the United States and defendants about release. And even that reading cannot withstand scrutiny, because, when the United States agrees to release (i.e., does not move for detention or withdraws its motion for detention), the undersigned Magistrate Judge invariably releases the defendant.[9]

Ultimately (as another member of this Court once expressed in denying an analogous motion), although the Recusal Motion endeavors to impugn "the [undersigned] Magistrate Judge's motivation, [the Recusal Motion] does not provide any factual support for such allegations . . . and [Petitioner] provides no evidence from which any such inferences [of bias] could be drawn." Burgess v. eBay,

_____

[9] Consistent with that reality, the undersigned Magistrate Judge granted Petitioner's Release Motion, which noted that "[t]he government does not oppose [Petitioner's] release with the condition that he be monitored electronically by U.S. Probation" (Docket Entry 8 at 1). (See Docket Entry 10.)

-27-

Inc., No. 1:11CV193, 2013 WL 3716872, at *2 (M.D.N.C. July 12, 2013) (unpublished) (Eagles, J.). Put another way, Petitioner has not provided the "clear averments or statement of facts required to support a motion for recusal and thus [the Recusal Motion is] insufficient to justify disqualification." Okocha, 2007 WL 1074664, at *4 (internal quotation marks omitted); see also Hill v. United States, Nos. 1:13CR435, 1:17CV1036, 2019 WL 7372962, at *1 n.1 (M.D.N.C. Dec. 31, 2019) (unpublished) (Schroeder, C.J.) ("[T]his court need not recuse itself because of unsupported, irrational, or highly tenuous speculation . . . ." (internal quotation marks omitted)), appeal dismissed, 831 F. App'x 626 (4th Cir. 2020), cert. denied, ___ U.S. ___, 142 S. Ct. 515 (2021).

<u>CONCLUSION</u>

Petitioner has not established any basis for recusal of the undersigned Magistrate Judge.

**IT IS THEREFORE ORDERED** that the Recusal Motion (Docket Entry 83) is **DENIED.**

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

August 2, 2022

-28-